STATE, Respondent, v. TARRELL, Appellant.

*No. 75–110–CR. Submitted on briefs October 7, 1976.—*
*Decided December 14, 1976.*
(Also reported in 247 N. W. 2d 696.)

648

For the appellant the cause was submitted on the brief of *David C. Pappas* of Madison.

For the respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Marguerite M. Moeller,* assistant attorney general.

BEILFUSS, C. J. The defendant challenges his conviction in several respects. Upon review he contends:

1. His compelled presence at the police station and the taking of his photograph by the police violated the fourth amendment of the United States Constitution.

2. The trial court erred in admitting evidence of other crimes and incidents.

3. The trial court abused its discretion in reading the victim's entire testimony to the jury.

4. The evidence was not sufficient to support a finding of guilty.

5. A new trial in the interest of justice should be granted.

On Sunday morning, August 25, 1974, a child, K.B., an eleven-year-old girl, her mother, father and ten-year-old brother, stopped at a grocery store-restaurant on their way home from church. The mother and father entered the grocery store and K.B. and her brother waited outside near the entry way.

K.B. was approached by a middle aged male. After a short conversation, the man took K.B. by the hand and wrist and led her up a half-flight of stairs to a landing. He lifted up her skirt and fondled her crotch area and kissed her. He asked her who her folks were and when she told him he indicated he knew them and left the area, going between cars through the parking lot. K.B. immediately went to her parents and informed her mother of what had transpired. Her father re-entered the store to inquire as to who the man was. The employees of the store had not seen him but reported the incident to the police.

The police interviewed K.B., her parents and her brother. K.B. gave a description of her assailant and the police subsequently notified the parents they knew of some suspects.

The defendant Tarrell was on a ten-year probationary period for a violation of sec. 944.12, Stats., enticing a child for immoral purposes. He had pleaded guilty to this charge on October 9, 1969, and was receiving outpatient psychiatric treatment.

The defendant's probation agent was contacted by the local police on August 25, 1974, the day of the incident in question. The probation agent requested the defendant to come to his office on August 28, 1974, and on that

date discussed the K.B. incident with him. The probation agent told the defendant to meet him at the local police station on September 3, 1974. He did so and his photograph was taken at that time.

A photographic display containing the photographs of seven individuals was assembled. One of the seven was the photograph of the defendant. A police officer and the probation agent took the photo display to the home of K.B. She was asked to look at the display to determine whether she could identify any of the photos as a picture of the man "that had bothered her." She looked at the display and circled the picture of the defendant. A complaint was filed and the defendant Tarrell was arrested the next day.

A jury trial was conducted on January 28–30, 1975. The defendant admitted he had been at Dick's, the store where the offense took place, about the same time that the crime was committed but produced a number of witnesses who were with him at that time. K.B. testified that the man who committed the crime was wearing a "brown suit with a gold shirt and a gold and brown stripe tie." Another witness testified that she saw Tarrell in the store wearing a suit but couldn't remember the color. The defense produced a number of witnesses who testified that Tarrell was wearing "wild" plaid pants and a brown shirt without coat or tie. Tarrell testified that he neither saw nor talked to the victim on August 25, 1974.

The state introduced evidence as to Tarrell's past crime of enticing a child for immoral purposes and as to other occurrences of a similar nature for which Tarrell was not charged. This evidence was admitted over objection of defense counsel.

Tarrell was found guilty on January 30, 1975, and subsequently committed to Central State Hospital under the provisions of sec. 975.06, Stats.

The defendant Tarrell, who was on probation, as stated above, was told by his probation agent to go to the police station to have his picture taken. He complied with this order but contends that this required appearance was an unconstitutional seizure of his body and that the subsequent photographic seizure of his person was also unconstitutional in that they violated the fourth amendment of the United States Constitution. He argues that his pretrial motion to suppress this evidence should have been granted and that all subsequent identifications were tainted.

The courts recognize that probationers do retain some fourth amendment rights.[1] "It is not the law that a person convicted of a previous offense loses his constitutional guaranties." *State v. Mier*, 254 Wis. 180, 184, 35 N.W.2d 196, 198 (1948). Concomitantly, this court has recognized that there are constitutional limitations on conditions of probation.[2] The question is what is the extent of this protection.

The fourth amendment requirement is that searches and seizures be reasonable. In *State v. Bell*, 62 Wis.2d 534, 539–40, 215 N.W.2d 535, 539 (1974), this court noted that the United States Supreme Court

". . . has stated that the ultimate standard set forth in the fourth amendment is reasonableness. *Cady v. Dombrowski* (1973), 413 U.S. 433, 93 Sup. Ct. 2523, 37 L. Ed.2d 706. This court has consistently adhered to the view that reasonableness is to be determined by the facts and circumstances presented in each case. *State v. Pires* (1972), 55 Wis.2d 597, 201 N.W.2d 153; *State v.*

[1] *Tamez v. State*, 534 S.W.2d 686, 692 (Tex. Ct. of Crim. App. 1976); *United States v. Consuelo-Gonzalez*, 521 F.2d 259, 262 (9th Cir. 1975); *State v. Schlosser*, 202 N.W.2d 136, 138–39 (N.D. 1972); *Martin v. United States*, 183 F.2d 436, 439 (4th Cir. 1950), *cert denied* 340 U.S. 904.

[2] *State v. Garner*, 54 Wis.2d 100, 105, 194 N.W.2d 649, 651 (1972).

*Davidson* (1969), 44 Wis.2d 177, 170 N.W.2d 755; *Edwards v. State* (1968), 38 Wis.2d 332, 156 N.W.2d 397. The fundamental rule applicable to searches and seizures is that warrantless searches are per se unreasonable under the fourth amendment except under certain well-defined circumstances. *Johnson v. United States* (1948), 333 U.S. 10, 13, 14, 68 Sup. Ct. 367, 92 L. Ed. 436; *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 454, 455, 91 Sup. Ct. 2022, 29 L. Ed.2d 564."

Discussing this fundamental rule that warrantless searches are unreasonable, in *State v. Elam,* 68 Wis.2d 614, 621, 229 N.W.2d 664, 668 (1975), this court quoted from *Coolidge v. New Hampshire, supra:*

" 'Thus the most basic constitutional rule in this area is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." The exceptions are "jealously and carefully drawn," and there must be "a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative." ' "

 If there is to be an exception to the requirements of the fourth amendment granting probation agents a limited right to search or seize a probationer without a warrant, the foundation for this exception lies in the nature of probation itself. Probation, like parole, "is an integral part of the criminal justice system and has as its object the rehabilitation of those convicted of crime and the protection of the state and community interest." *State ex rel. Niederer v. Cady,* 72 Wis.2d 311, 322, 240 N.W.2d 626, 633 (1976). While probation is a privilege, not a matter of right,[3] once it has been granted this conditional liberty can be forfeited only by

---

[3] *State v. Gerard,* 57 Wis.2d 611, 619, 205 N.W.2d 374, 379 (1973), *appeal dismissed* 414 U.S. 804.

breaching the conditions of probation. A sentencing judge may impose conditions which appear to be reasonable and appropriate. Sec. 973.09, Stats. A sentence of probation places the probationer "in the custody of the department" subject to the conditions of probation and rules and regulations of the Department of Health & Social Services. Sec. 973.10. All conditions, rules and regulations must be imposed with the dual goal of rehabilitation of the probationer and protection of the public interest. The imposition of these conditions, rules and regulations demonstrates that while a probationer has a conditional liberty, this liberty is neither as broad nor as free from limitations as that of persons who have not committed a crime. The expectations of privacy of a person on probation cannot be the same as the expectations of privacy of persons not on probation. It is only the reasonable expectations of privacy which the fourth amendment protects.[4] Conditions of probation must at times limit the constitutional freedoms of the probationer. Necessary infringements on these freedoms are permissible as long as they are not overly broad and are reasonably related to the person's rehabilitation. By the very nature of probation, limitations on the liberty and privacy of probationers are imposed. These limitations are the bases for an exception to the warrant requirement of the fourth amendment. "[S]ome forms of search by probation officers are not only compatible with rehabilitation, but, with respect to those convicted of certain offenses, . . . are also essential to the proper functioning of a probationary system." *United States v. Consuelo-Gonzalez, supra* at 265.

█ The ultimate standard set forth in the fourth amendment is reasonableness. One condition of probation requires the probationer to obey all laws of the State of

---

[4] *Terry v. Ohio,* 392 U.S. 1, 9 (1968), citing *Katz v. United States,* 389 U.S. 347, 351 (1967).

Wisconsin. The agent has a duty to determine whether a probationer is complying with all probation conditions. The agent had confronted Tarrell with reports of other "sexual incidents" which had occurred and which he admitted were essentially true. Tarrell was on probation for enticing a minor for immoral purposes and his agent was informed that the defendant was a suspect in a similar offense. Because of these other "sexual incidents," the similarity between the probationer's prior offense and this offense, and the agent's awareness that Tarrell was a suspect, he ordered him to appear at the police station to be photographed. While there may not have been probable cause for the issuance of a warrant, there was probable cause for the agent's attempt to determine whether Tarrell had complied with the probation conditions. The application of a less stringent standard for the probation agent's search or seizure is appropriate because of the nature of probation. It coincides with the agent's dual role of assisting the probationer in his rehabilitation and protecting the public.[5]

█ Repeatedly, this court has maintained that the reasonableness of a search or seizure is to be determined by the facts and circumstances of each case. *State v. Bell, supra* at 540, 215 N.W.2d at 539; *State v. Pires,* 55 Wis.2d 597, 201 N.W.2d 153 (1972). The "seizure" of Tarrell was only for a short time and for the purpose of identification. The procedure adopted might well have inured to the benefit of Tarrell. If K.B. could not or would not have identified him as her assailant, he would no longer have been under suspicion.[6] In light of the facts known by the agent, the order that Tarrell make

---

[5] *See: Latta v. Fitzharris,* 521 F.2d 246 (9th Cir. 1975).

[6] *State v. DiMaggio,* 49 Wis.2d 565, 586, 182 N.W.2d 466, 478 (1971).

himself available for a photograph was reasonable and constitutionally valid.[7]

As the state notes, the obtaining of physical evidence from a person involves a potential fourth amendment violation at two different levels. First, the seizure of the person necessary to bring him into contact with the government agents, and second, the subsequent search for and seizure of the evidence.[8] Tarrell's presence at the police station was obtained legally and the photograph taken as a result of this appearance furthered the reasonable efforts of the probation agent to determine whether Tarrell had complied with probation conditions. In rejecting the argument that a grand jury's requirement of a voice recording was a violation of the fourth amendment, the United States Supreme Court stated that the amendment "provides no protection for what 'a person knowingly exposes to the public. . . .' " *Dionisio, supra* at 14. The court went on to say:

"Like a man's facial characteristics, or handwriting, his voice is repeatedly produced for others to hear. No person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world." *Id.*

▉▉▉ The photographic recording of the defendant's facial characteristics merely preserved that which he regularly exposed to the public. This "seizure" of the evidence, *i.e.*, the actual photographing, was certainly less an invasion of the defendant's reasonable expectation of

---

[7] *United States ex rel. Randazzo v. Follette*, 282 F. Supp. 10, 13 (S.D.N.Y. 1968), *aff'd* 418 F.2d 1319 (1969), *cert. denied*, 402 U.S. 984 (1971).

[8] *United States v. Dionisio*, 410 U.S. 1, 8 (1973), citing *Schmerber v. California*, 384 U.S. 757 (1966), and *Davis v. Mississippi*, 394 U.S. 721 (1969).

privacy than was present in *Schmerber, supra,* where the Supreme Court found that a warrantless seizure of a blood sample to determine the percentage of alcohol in the blood did not violate the fourth amendment. The seizure of the blood sample was reasonable under the circumstances of the case. So also was the compelled appearance to be photographed and the photographing reasonable under the facts of this case and therefore constitutional.

The defendant next argues that it was prejudicial error to permit the introduction of evidence that the defendant: Had in 1969 been convicted of enticing a child for immoral purposes; had in February, 1973, unzipped his pants and masturbated in the presence of two young female hitchhikers he had picked up; and had in the summer of 1974 made an inappropriate or obscene remark to a girl.

In Wisconsin the admission of evidence relating to other crimes or acts of the accused is governed by sec. 904.04(2), Stats.:

"*Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

This subsection creates an exception to the general rule excluding circumstantial use of character evidence. The problem with admitting other crime evidence to show motive, plan, or intent is the possibility, or even probability, that a jury may conclude that since the defendant did it once he did it again. Courts are aware of this danger—in *Whitty v. State,* 34 Wis.2d 278, 295, 149

N.W.2d 557, 564 (1967), this court held that, in order to assure a fair trial, a trial court must carefully consider whether the prejudice of other-crimes evidence is so great as compared with its relevancy as to necessitate the exclusion of the evidence. The trial court here was also aware of the possibility of prejudice and was particularly concerned with the remoteness in time of the other crime. But, considering all the sexual incidents, it found that they might establish a general plan or system of conduct or that they might establish a motive or intent to perform an act such as the one charged. It relied on language of this court in *Hendrickson v. State,* 61 Wis.2d 275, 279, 212 N.W.2d 481, 482 (1973) :

> "A 'greater latitude of proof as to other like occurrences' is clearly evident in Wisconsin cases dealing with sex crimes, particularly those involving incest and indecent liberties with a minor child."

Hendrickson catalogued the many cases of this and other jurisdictions which supported this rule. An Ohio court was quoted to explain the rationale. " 'The separate acts of incest by the defendant with his several daughters are "so related to the offense for which the defendant is on trial that they have a logical connection therewith and may reasonably disclose a motive." ' " *Hendrickson, Id.* at 281, 212 N.W.2d at 483. So too here, the separate acts, ranging from inappropriate comments to a girl, to enticing a minor for immoral purposes, demonstrated a propensity to act out his sexual desires with young girls and had a logical connection with the charged offense. They tended to show a general scheme or motive. While the admission of this evidence was prejudicial, it was extremely relevant and was appropriately admitted. The probative value exceeded the prejudicial effect and as such was admissible.

The defendant contends that the reading of the entire testimony of the victim to the jury deprived the de-

fendant of a fair trial. The defendant acknowledges that a trial judge may exercise discretion as to the reading of testimony to a jury, *State v. Cooper*, 4 Wis.2d 251, 255–56, 89 N.W.2d 816, 819 (1958), but argues that because the jury's request for the victim's testimony only related to two points: (1) What the victim was told by the police officer prior to being shown the photographic display; and (2) the location of the bald spot on her assailant's head, it was an abuse of this discretion to read her entire testimony. In deciding motions after verdict, the trial court set forth its reasons directing that the victim's entire testimony be read:

". . . Testimony regarding the bald spot was scattered throughout her direct testimony, her cross-examination and, as I recall it, her redirect. The Court concluded that the only fair method that could be employed was to direct the court reporter to read the entire testimony of the victim Kristen, which was done; all of it was read, the direct, the cross, the redirect, and the re-cross if any. And that reading was completed at 5:45 o'clock p.m. And the jury then quite promptly, at 6:05 p.m. reported to the bailiff that they had reached a verdict.

"I know of no fairer way that this Court could have handled the situation than to have read all of the testimony of that witness. It would have been almost a physical impossibility for the Court Reporter to intelligently scan through her notes and read only those isolated questions concerning the bald spot. . . ."

The testimony which was read back to the jury was not entirely favorable to the state's case. At one point in the questioning the victim indicated that she had given incorrect answers to questions asked of her at the preliminary examination on September 30, 1974. She also stated unequivocally that the man who assaulted her had been wearing a brown suit, gold shirt and striped tie at the time, while the defense produced evidence showing that the defendant was attired in plaid pants and

a brown shirt at the time the offense was being committed.

■ Because the evidence which the jury wanted read back was scattered throughout the record, and because the testimony of the victim was not entirely prejudicial to the defendant, there was no abuse of discretion in directing that the victim's entire testimony be read to the jury.

The defendant argues that the evidence was insufficient to support a conviction of the crime charged, primarily because the only evidence linking him to the crime is the victim's identification of his picture. He contends that that evidence should have been excluded along with all subsequent, tainted identifications. The photo identification was properly admitted and, thus, this contention is of no avail.

A significant fact is that defendant admitted he was at the place and time of the incident.

■ There was other conflicting evidence but the jury heard all of this and concluded the defendant was guilty. In reviewing the record for the sufficiency of the evidence, this court will not retry a criminal case on the facts of the record.[9] The test on review is whether the jury acting reasonably could be so convinced.[10] This court has held that the uncorroborated eyewitness testimony of the victim is sufficient to sustain a conviction. *Hemauer v. State,* 64 Wis.2d 62, 218 N.W.2d 342 (1974). It is apparent the jury believed her testimony, including her identification of the defendant. We conclude the credible evidence as it appears in the record is sufficient to sustain the verdict.

The defendant seeks a new trial pursuant to sec. 251.09, Stats., which gives this court the discretionary power to remand for a new trial if, for any reason,

---

[9] *State v. Chacon,* 50 Wis.2d 73, 74, 183 N.W.2d 84, 85 (1971).
[10] *Hicks v. State,* 47 Wis.2d 38, 176 N.W.2d 386 (1970); *Lemerond v. State,* 44 Wis.2d 158, 170 N.W.2d 700 (1969).

justice has miscarried. We do not believe justice has miscarried, therefore we do not order a new trial in the interest of justice.

*By the Court.*—Judgment and order affirmed.

ABRAHAMSON, J. *(dissenting)*. I believe the majority has erred in its application of sec. 904.04(2), Stats., to this fact situation; I respectfully dissent.

The general rule is that all facts having a logical probative value are admissible in evidence unless excluded by a specific rule. Sec. 904.04(2), Wis. Rules of Evidence, specifically excludes evidence of prior crimes or past conduct to substantiate general bad character and criminal propensity and to prove guilt. This prohibition is not based on relevancy. The evidence is relevant. Life has taught us (rightly or wrongly) that a bad person, a person of "criminal character," is more apt to commit a crime than a good person; and at the same time we know that a person may do certain acts for a time and then may never do them again. The prohibition on character evidence is based on the danger of prejudice outweighing probative value. Wigmore states that character evidence is "objectionable, not because it has no appreciable probative value, but because it has too much. The natural and inevitable tendency of the tribunal— whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge." Wigmore, *Evidence,* sec. 194, p. 646 (3d ed.). Our court has said the rule is " 'predicated on the fundamental principle of justice that the bad man no more than the good ought to be convicted of a crime not committed by him.' " *Fischer v. State,* 226 Wis. 390, 402, 276 N.W. 640 (1937).

The rule against admission of prior misdeeds as bearing on the issue of guilt is, as the majority notes, subject

to exceptions set forth in sec. 904.04(2) of the Rules of Evidence. The difficulty with the majority opinion is that it so broadly construes the exceptions in cases in which indecent liberties with a minor child are charged that the exceptions now obliterate the general rule.

The exceptions listed in the statute are not mutually exclusive. The exceptions slide into each other; they are impossible to state with categorical precision and the same evidence may fall into more than one exception. The majority finds that the defendant's prior deeds are relevant to motive and to plan or general scheme. Motive is a difficult word to define but this court has said "Motive is the reason which leads the mind to desire that result." *Baker v. State*, 120 Wis. 135, 145–146, 97 N.W. 566 (1903). An example of evidence which shows motive is as follows: Proof of husband-defendant's adulterous relationship with his sister-in-law and his attempt to obtain divorce was admissible in trial of the husband for the murder of his wife to show his motive for the killing. *Comm. v. Hellex*, 269 Pa. 467, 87 A.2d 287 (1952). The adultery showed the reason why defendant desired the result of the crime charged.

The word "plan" means a design or scheme formed to accomplish some purpose. In *Leonard v. United States*, 324 F.2d 911 (9th Cir. 1963), the defendant obtained treasury checks payable to others, induced A to forge endorsements and induced B to obtain false credentials, cash the checks and split the proceeds with the defendant. Evidence of all acts was admissible to prove the existence of a larger scheme of which the crime charged was part.

The charge here was indecent liberties with a minor in August, 1974. The act was fondling the crotch and kissing. Evidence of prior conduct was introduced in the form of a prior conviction and testimony of past conduct related by a probation officer. The prior conviction was in 1969 for enticing a child for immoral purposes.

The record does not give the facts of the 1969 offense. The probation officer testified the defendant told him (1) in 1973 the defendant masturbated in the presence of two young female hitchhikers, and (2) in August, 1974, the defendant made inappropriate obscene remarks to a girl. None of these misdeeds show motive; none show "the reason which leads the mind to desire that result." Again we note motive is a difficult concept to grasp. Here one can say the defendant's motive for committing the crime charged is to obtain sexual gratification with young girls. Therefore prior incidents prove this motive of sexual gratification. But in this case, defining motive in that manner is really defining propensity to commit a crime. Let us look at the crime of theft. The motive for committing theft is to obtain wealth without honest labor. Therefore prior incidents of theft prove the defendant's motive of obtaining wealth dishonestly. Absent other factors we would not permit evidence of other thefts to prove motive for the theft charged. The motivating forces for a person's conduct are not the equivalent of the legal concept of "motive," which relates to the specific crime charged rather than to a generalized urge or goal.

Nor do these deeds go to show a plan. We have three separate acts, ranging in time over a period of five years. They are not part of a design formed to accomplish some purpose. They appear to be dissimilar types of sexual misconduct.

Evidence of these incidents was designed to prove defendant's propensity and disposition toward sexual misconduct. This evidence could only have been designed to convince the jury that previous acts by the defendant are indicative of his guilt of the act charged in this case —to establish an inference that the accused is a dirty old man, and that he therefore probably committed the dirty act charged here. It seems to me the very purpose

of the rule is to exclude evidence which is relevant only for showing a disposition to commit a crime.

The cases cited by the majority do not require the result reached here. In *Whitty v. State,* 34 Wis.2d 278, 291, 149 N.W.2d 557 (1967), the prior misdeed of the defendant was used to prove identity. The day before the perpetration of the crime charged, the defendant was shown to have used the same "lost white and black rabbit" trick to entice another youngster. This youngster was quite properly allowed to testify to this incident and to identify the defendant as the man. Identity may be shown by evidence of this type. However, to prove identity the other like crimes must be so nearly identical, so unusual and distinctive, as to be like the defendant's signature. McCormick on *Evidence,* sec. 190, p. 449 (2d ed. 1972).

In *Hendrickson v. State,* 61 Wis.2d 275, 280, 212 N.W. 2d 481 (1973), also cited by the majority, incest was charged. Testimony of prior acts of intercourse between the complaining witness and the defendant, who was her father, and testimony as to acts of intercourse between two other daughters and the father were held admissible to show the defendant's plan or common scheme and motive or intent. *Hendrickson* follows the approach that many courts have taken in allowing evidence of repeated illicit sexual relations with a particular complaining witness and of allowing sexual acts with other family members in the case of incest. However, I do not believe that the *Hendrickson* case opens the door to the introduction of all acts of sexual misconduct with any person whatsoever in all types of sex cases.

I concede that in sex cases courts have been more willing to admit evidence of other offenses. *See* cases collected in Anno. *Admissibility, in Prosecution for Sexual Offense, of Evidence of Other Similar Offenses,* 77 A.L.R.2d 841 (1961) and A.L.R.2d *Later Case Service* (1974).

However, this approach has been criticized by the following thought-provoking language:

"In sex cases courts have been more liberal in the admission of evidence of offenses other than that charged. Although in some types of sex offenses and under some circumstances there may be justification in this approach, there is a grave question whether the distinction as frequently applied is not the result of an emotional rather than a logical approach to the issue. As a matter of fact in some respects there should be no distinction between sex offenders and other offenders, while in other respects there should be a distinction between different types of sex offenders.

"In actuality, is one with a record of indecent exposure more likely to commit rape than one with a record of assault and battery so that evidence of previous conviction of the sex offenses should be admitted and evidence of the non-sex offense rejected? Are there more recidivists among sex offenders than among thieves or other offenders? Should evidence of previous conviction of prostitution be admitted against one charged with that offense, and evidence of previous conviction of pickpocketing not be admitted against one charged with that offense? These are only a few of the questions which must be answered in the affirmative before a court can say with logic that the general rule *should not* apply to sex offenses and therefore *does not* apply to sex offenses.

"Let us again refer to the reasons for the adoption of the general rule so that we may determine whether or not they are as applicable to sex offenders as to other offenders.

"The reasons set forth by both our Supreme Court and Wigmore are that to hold otherwise would (1) cause the defendant to meet a charge of which he had no notice and make it impossible for him to refute fabricated charges; (2) raise collateral issues and divert the attention of the jury from the crime being charged; (3) result in the proof of the prior offenses being taken by the jury as justifying a condemnation of the defendant irrespective of his guilt of the offense charged. It is self evident that these three reasons are as applicable to sex offenses as to other offenses. The fourth reason given by the Supreme Court and Wigmore for the rule is that because A did act x last year it is no indication that

he did act x as now charged. Although the soundness of this last statement is almost universally accepted by the Courts of the United States and England let us assume there is room to debate its validity under certain circumstances. Let us then see whether the above statement would be invalid when applied to sex offenses. Whether the statement has validity in any case depends largely upon the likelihood that an offender will repeat an offense he previously committed. As pointed out in Footnote 2, supra [not quoted here], sex offenders are no more likely to repeat than other offenders.

"Thus since all the reasons for applying the rule are as applicable to sex offenders as to other offenders, there is no more reason to admit prior offenses to show depravity or propensity in a sex case than in any other case. Nor is there any reason to contort the exceptions to the general rule in order to permit the admission of evidence of a former offense, when in fact the only purpose is to show depravity or propensity." *Commonwealth v. Boulden,* 179 Pa. Super. 328, 116 A.2d 867, 873, 874 (1955).

I share the concerns expressed by the Pennsylvania court. In my view there is no sufficient justification for excepting the evidence of past misdeeds involved here from the general proscription of the character evidence rule.[1]

---

[1] "Yet courts have lost all feeling for tradition and the meaning of prejudice when applying rules of exclusion in prosecutions for sex offenses. . . . This liberality arises from a general (and somewhat spurious) notion that the mere fact of commission of a similar offense has more probative value in proving the commission of the offense charged in cases involving sexual crimes than it does in cases involving other crimes. Sex crimes are often motivated by an abnormal pattern of emotional maladjustments and personality difficulties, and medical authorities will in large part agree that certain sex offenders will follow a definite pattern of action when committing crime in any given instance. Yet it hardly seems rational to assert that disposition alone without more will furnish strong probative evidence that crime has been committed on the occasion in question.

"One need not display an imposing list of statistics to indicate that community feelings everywhere are strong against sex offenders. . . . When deciding the issue of guilt or innocence

And, even if one accepts the theory that the evidence can be pigeonholed into one of the exceptions in sec. 904.40(2), Stats., I believe that in this case it was reversible error to admit the evidence. Considering the time span and the dissimilar nature of the offenses, I conclude that the probative value of the evidence was far outweighed by the danger of undue prejudice.

Considering the record in this case, I view the admission of the evidence of prior misconduct as prejudicial error, and I would reverse and remand for a new trial.

I am authorized to state that Mr. Justice HEFFERNAN joins in this dissent.

in sex cases, where prejudice has reached its loftiest peak, our courts have been most liberal in announcing and fostering a nebulous exception, offering scant attention to inherent possibilities of prejudice. Just when protection is most needed, the rules collapse.

"There is also a tendency among civilized people to label the sex offender as a *repeater*, and the current literature of psychiatry will frequently indicate that the sex criminal has a high rate of recidivism. This spurious thesis in turn supports the liberal trend in judicial rulings with regard to disposition and inclination. However, reliable statistics do not invariably support this contention. According to reports by the Federal Bureau of Investigation reflecting information on twenty-five different types of crime, it was noted that drug addicts had the largest proportion of previous convictions and stand first in recidivism in the list of twenty-five crimes. Larceny was second, vagrancy third, drunkenness fourth, and burglary fifth. Rape stood nineteenth in line, near the bottom of the list, and 'other sex offenses' tied for seventeenth place." Slough & Knightly, *Other Vices, Other Crimes*, 41 Iowa L. Rev. 325, 333–334 (1956).